Mr. Kundu, you're reserving seven minutes for rebuttal, is that correct? Yes, Your Honor. And Mr. Needham, you're going to argue first for eight minutes, and you're dividing your time with Mr. Sandow for seven minutes, is that right? Okay, Mr. Kundu, you may proceed. Good morning, Your Honors. The fundamental error below was a failure to properly take account of the full disclosure of the 320 patent, whose written description shows possession of a container adapted to hold brewing materials. Specifically, the commission's determination was based on a restricted definition of pod, even though that word is defined more broadly in the summary of the invention. So although the patent's background sections does say that pods are typically flat, disc-shaped paper packets containing coffee, the summary of the invention defines pod more broadly. Even there, and wherever pod is used, it seems to me that what we're talking about is some sort of a pouch or a paper pouch with coffee in it, and that the pouch acts as a filter, is that correct? Your Honor, we would disagree with that. Certainly, as pod has been defined, and the supporting evidence, pod is very broad. You disagree that the specification describes a pod in this manner, or are you saying you would want it to have a different type of description? Well, certainly, Your Honor, there are embodiments and there are descriptions of a pod in the specification that are flat, disc-shaped. So back to my question, wherever the specification uses the word pod, it's talking about a filter or a paper capsule with coffee in it, and that the paper acts as a filter. Your Honor, that's where we would disagree, based on the definition of the term as used in the summary of the invention section. The term here is pod adapter assembly, and so the broad meaning of pod comes into play because the broad meaning is a package containing a water-permeable material containing coffee. So pod modifies the adapter assembly, and the record evidence, when a person of ordinary skill in the yard reads that definition, they would know that there are a multitude of water-permeable materials that can be used. So pod adapter assembly conveys to a person of ordinary skill a container that can use the paper packet, a filter cup, an integrated filter, and so on, nylon filter, and so on. So it's that broad definition of pod that's in the invention that differs from the definition in the background, which gives the specification a broader scope. Well, I see three different definitions in the specification for pod. The first one in the background section that calls it a small, flattened, disc-shaped filter package of beverage extract. The second one is that pods are typically somewhat flattened, disc-shaped filter packets containing coffee. And then the third is where it says it should not be limited to, and it could be a little bit broader than this, but we're looking at basically a package formed of water-permeable material and containing an amount of coffee and other beverages that are in. Now, based on those three explanations, that's why I say that it seems to me that the specification, when it refers to a pod, is talking about a capsule, paper or filter on it containing coffee. How do you jump from that to an adapter that doesn't have coffee in it and doesn't have a paper filter? So, Your Honor, let me step back and say the definition in the specification doesn't refer to flattened, disc-shaped paper packets, which are part of the two other definitions you talked about, which come from the background. And so, in the background, there are problems discussed in the prior art, one of which is that Keurig machines, these single-serve brewers, are limited to, because of the configurations of their brewing chambers, they're limited to these cup-shaped cartridges, which is, it's K-cup. And so, that's a problem contemplated in the invention. And certainly, we're not denying that. In the specification, there are embodiments that talk about using a paper packet in a container. However, when it comes to written description, that's not the full scope of the specification. What I mean by that is, we're talking about a pod adapter assembly. Pod is always going to be governed by that broader definition, because it's from the summary, not the background. And so, there are embodiments, figure 1A, figure 2, figures 3A and 3B, especially, I think it's 3B, that don't show a paper packet. They show a container that avoids the needle. And I would also add- Is it fair to say that there's nothing in the spec that shows an example of a pod? If it's anything other than a prepackaged unit that's holding coffee grounds, where the package is water permeable. Your Honor, in terms of the disclosures in the embodiments- Yes. I would say, when it comes to a pod, it's shown that way. When it comes to a pod adapter assembly, it's not shown that way. And so, the narrowness of- Where is it not shown that way? I would say figure 1A, Your Honor. Figure 1A, there's no pod in there. Right. That shows a pod adapter assembly. Figure 3B has also- Let me make sure it's either 3A or 3B. I guess what I'm concerned about is, I still don't know exactly what your definition, what your articulation of what a pod is, as one of ordinary skill in the art would read this patent. And all I can tell from your position is, it's something broader than a package that's water permeable, holding coffee grounds. I mean, what is your actual articulation? Is it a filter? Anything, any filter element is a pod? No, Your Honor. Okay, what is it then? It's a package of- It's a package containing a water- Excuse me. It's a package containing water permeable material, inside of which is some brewing material. So, under that broader definition of pod, a K-cup would qualify. K-cups with pods. And that's a problem I have, because the whole purpose of the invention is to not have to use K-cups. The whole purpose is to be able to use something called pods instead of K-cups in a K-cup brewer. So, you know, right there, right out of the box, I can't think of the word pod as being so broad that it also encompasses K-cups. It has to be something other than K-cups. Well, Your Honor, the record evidence certainly showed the Kirshner reference, for example, was a coffee and tea pod. It had a rigid structure. It was more akin to a K-cup. Now, what the term is, is pod adapter assembly. Okay, so pods- Right, you're trying to adapt a K-cup brewer so that you can make coffee with pods. And so, now I know, right there, that whatever a pod is, it's not a K-cup. Your Honor, our position is that the pod adapter assembly, because the adapter assembly is like a pod, that that's something I can use in a K-cup that's not a K-cup. Because a problem in the background is that the Keurig machines are inherently limited to K-cups. Well, didn't Mr. Rivera, during prosecution, he described, he said that the pod adapter assembly describes a pod adapter which compacts a pod to improve brewing. So here, he's using the pod adapter with a pod in it. Your Honor, we're definitely not denying that there are embodiments that have that. Our issue is that the spec was not limited to those embodiments. So, for example, again, figures 1A, figures 3, there's no tamper there. But those are embodiments that could be. It seems like everything in the specification that deals with the pod assembly talks about accepting a pod. And that's your problem, right? Well, Your Honor, we would also disagree with that. So, for example, the protrusions 330 in figures 3A and 3B, while those are in figures 3A and 3B, the specification makes clear that those are preferred but not required. And that's a position that the Commission is taking. That's evidence that every embodiment must take a paper packet. So, our position, certainly based on, I mean, I would also add that the problem is there's two definitions in the background. And then there's a different definition in the summary of the invention. And so what's happening, I believe the decision below equated the two definitions. And so there wasn't record evidence for that equating of those two definitions. In fact, under the broader definition, that's what brought in the broader pod adapter assembly. The claim term is a container adapted to hold brewing material. It's not a primitive, it's not an uncertain claim term. In fact, the record evidence found that all these different water permeable materials, not only were they well known, but they had been well known for 20 plus years before the time of invention. So, and that being said, it was also true for the meaning of pot. So, the definition, the ITC would presume that two different definitions, ones from the background and the ones from the specification, are the same, but textually they're different. And then in the context of how a person of ordinary skill in the art would read the broader definition, that had a meaning to a person of ordinary skill in 2007. And there was plenty of record evidence showing that, yes. You have an expert that testified, correct, Dr. Howell, that the use of a separate pod is required. He said, otherwise the invention's not going to work because you're going to have coffee that's going to clog up the hole at the bottom of the assembly. So, isn't that substantial evidence? Your Honor, it's not substantial evidence. And we submit that Dr. Howell applied the background's definition of pod. So, that's the flattened disc shape. It's very explicit. It's, I believe, appendix 2192. That's the definition he's applying. And we would also state that, I believe Dr. Howell testified, but certainly it's in the intervener's brief, that the embodiments don't work if you don't use, they say, a pod or a filter. And we agree with that. Yes. So, what that tells you is, of course, the embodiments aren't limited to a flattened disc-shaped paper packet, but you could use a filter. Well, if you could use a filter, then why couldn't you use the other known filtration types that are encompassed within the definition of water permeable in the summary of the invention? Okay. Is there any embodiment that shows the use of a filter integrated into the cartridge? There's not a specific embodiment that shows that. The only embodiments that are shown use separate pods. The embodiments shown, Your Honor, according to the record evidence, and it's the same figures I'm pointing out, because there are figures that show a pod inside the capsule. There's no question about that. But there are also figures that show that the capsule, there's no filter in there. There's no pod in there. And so what you would know from the person of ordinary skill is, yeah, I could put a filter in there. I don't need to put a pod in that design. I could also put in a metal mesh filter across the passageway. You're talking about the figure 1A, which just shows an incomplete embodiment because it doesn't show the coffee in it. Your Honor, so that's where I go back to the argument. You say, yes, a person of ordinary skill in the art would know you have to put coffee in this thing, but the rest of the disclosure would make it perfectly clear that you do so by putting a pod in there. Well, Your Honor, I go back then to one of the explicit purposes behind this invention, which is column 1 lines 39 to 41. The problem with Keurig machines is that they're inherently limited to K-cups. That's the problem. And so what figures 1A, 2, 3B are showing is here's my pod adapter that I can put into a Keurig machine. What kind of filter do you want to use? The multitude that have been known for decades. And so Solofil in their breed... Well, we wouldn't be here if the specification said that, but it doesn't. Well, Your Honor... It doesn't say you use the multitude of filters that have been used for decades. And Your Honor, that's where we come in with the definition of pod, which just says water permeable material containing coffee. So the water permeable material... That probably says a package formed of water permeable material. That's correct, Your Honor. Okay. So it would be a package. These pod adapter assemblies... You kind of want the coffee to be compacted too, correct? Not necessarily, Your Honor. Like I said, figures 1A, 2, 3B. There's no tamper there. No, but I look at figure 1A and it seems to me that one skilled in the art would look at that and say, okay, I understand that. All I need to do now is to put a pod in there and I'm ready to go. That's one possibility, Your Honor. It's not the only one. And the record evidence said based on the definition of pod. I mean, if the specification... I would say this. If the specification were limited to the definition of the background, then you would have had that definition in the summary of the invention. I mean, the idea is what we can't forget is that there are two different definitions. So the ITC and Solofill are trying to say that they're the same, but there's no record evidence to support that. So what you have is the ITC saying, well, this invention is a container that contains the pod of the background. But Tronzo made clear that the background is inapplicable to the written description analysis. It's what the invention actually describes that written description. Okay, let's hear from Mr. Needham now. May it please the Court. Norm talks about pod like it's a claim construction issue. But pod is in the specification, not the claims. The relevant standard is whether substantial evidence supports the commission's written description determination. And the record provides that substantial evidence. Both experts agreed that the claim container adapted to the whole brewing material needs some sort of filter to function. And both experts agree that the invention that's actually described in the 320 patent does not disclose such a filter. Now, Mr. Phillips, arms expert on Appendix 712 to 721, he goes through each figure and he says none of these figures disclose a filter. And that includes 1A, 2, and 3B that were just referred to. What about the definition that's in the patent in column 1, first paragraph? It says as used here in the term pod is a broad, so it's seeking to broaden the term, is a broad term and shall have its ordinary meaning and shall include but not be limited to. And then it goes on to describe a pod. Wouldn't that, if I read that and I go back to figure 1A and I say, okay, I know I can put a pod in there, but I'm not limited to that. I can also just drop in a paper napkin and pour coffee in there and I'm good to go. Well, first I'd say there's no depiction of any such filter anywhere in the patent. But pod means the same thing throughout the entire 320 patent. But for one skill in the art, a filter is a filter. I mean, you know you can filter through a napkin or a steel mesh or other things. It doesn't have to be a pod, does it? It does have to be a pod because that's the only form of filtration. But you're talking about the definitions in the patent. It says it's not limited to, shall include, but it's not limited to a pod. The written description is based on what's actually disclosed in the four corners of the patent. And a pod is disclosed in the patent and a pod, a package formed of water permeable material, which is really just a synonym for a filter package, is also disclosed. But there's no suggestion of any sort that any other filter could be used in any of these inventions. And that's consistent with the specifications use of pod as a filter package throughout the entire patent. The tamping mechanisms compress the pod with the spring. The figures 3A, 4, and 5 depict the flexible filter package. And the three incorporated pod brewing patents all use pod to refer to paper filter packages. However, that definition says that pod has its ordinary meaning. And logically, since we've already given two meaning of pods, it's saying simply that this is the pod that we're talking about. And moreover, pod having two different meanings doesn't make any sense in the context of this patent. In fact, the invention is adapting a prior art cartridge brewer to brew a prior art pod. So when this embodiment describes adapting and tamping pods, they're talking about adapting and tamping those prior art pods that are described in the background. So this is different from Tronzo. The invention is supposed to be used with the prior art. And that's the prior art pods that are these filter packages. Now, even if this court agrees with Arm's erroneous view of pod, these claims still lack written description. Under Lockwood, the specification has to disclose all the limitations of the claimed invention. And it can't just render the claimed invention obvious. Now here, Arm acknowledges that the claimed invention requires a filter and acknowledges that none of the embodiments disclose a filter. Now, Arm tries to bridge that gap by stating that a person of ordinary skill would know that types of filters exist and would know that they could pick those filters and use those and add them to the embodiments to make the claimed invention. But that's exactly what Lockwood prohibits. So even under Arm's broad view of pod, a person of ordinary skill could only arrive at the claimed invention by using outside prior art to substantially modify the disclosed embodiment. And that shows that the specification itself doesn't actually disclose the claimed invention. So what happens if you use the invention, the invention as disclosed, use it without a pod? Would it work? No, it would not, Your Honor. If you just poured coffee directly into it, as Dr. Hawley testified, it would just fall through the device and end up in whatever you were trying to brew. And when Arm talks about Kirshner and the K-cup can be a pod, these things don't fit at all. Like, the K-cup already works in a Keurig brewery, so it's inconceivable what a pod adapter would even be if a K-cup is a pod. Now, in their brief, Arm pointed out that the commission cited some materials subject to a motion in limine. I apologize for that. The parties failed to redact the commission record to reflect that ruling. But it's a harmless error. It's only a single witness statement response, and every site to it has at least one parallel citation. And the commission opinion didn't even rely on that material. So there's still substantial evidence. And Arm talked a lot about the third problem in the patent. There isn't a third problem in the patent. There are two problems in the patent. That cartridge brewers like the Keurig can't brew pods, and that pods don't taste good when you brew them. Look at figure 1A. Why wouldn't somebody skilled in the art look at that and say, well, if I pour the coffee grinds in there, they're going to fall through that little hole at the bottom. How about if I put a napkin in there and then put the coffee grinds? The problem with that is that's not disclosed in the patent. That's along the lines of Lockwood. That would work, don't you think? I think it would work, but that's not disclosed in the patent. So it goes along the lines of Lockwood that this is essentially an invitation to substantially modify this invention to come up with a completely different invention. But the written description is based on the four corners of the actual specification. Finally, one last thing on Solifil's economic prong argument. For Motorola Mobility, Arm can satisfy the economic prong through investments in a significant component. The article here is a combination of the Arm capsule and Keurig Brewer. The Arm capsule is a significant component of that combination,  If there are no questions, I have nothing further. Thank you very much. Mr. Sandell? Good morning, and may it please the Court. I'm Lawrence Sandell on behalf of Intervenor Solifil. With my allotted time, I plan to first address the written description requirement, but from a slightly different angle than the Commission took, and then I will touch on two of our alternative grounds for affirmance. The uncontested evidence convincing Solifil's reasonable good-faith belief of non-infringement, and then with respect to the economic prong of the domestic industry requirement, the purely legal questions of if and how Motorola Mobility applies to an article that's comprised of multiple distinct products. If we affirm on the written description invalidity ground, then your cross-appeal is moot, is that right? It's not technically a cross-appeal, but that is correct. The other grounds are moot if you affirm on the written description ground. So, as Arm acknowledges, the Commission's ruling must stand if this Court recognizes that the written description determination is supported by more than a mere scintilla of evidence. The term at issue is a container adapted to hold brewing material, and this is a broad limitation that was not in the original claims. Arm sought and received a plain meaning construction for this term, and under that plain meaning, it did not require a separate pod, and it encompassed containers with integrated filters, like Solifil's products, that could accommodate loose coffee. The disclosure is ambiguously and comprehensively directed toward holding brewing material in a pod separate from the claimed container. Indeed, the evidence is overwhelming that the disclosure plainly does not disclose, suggest, or even contemplate an adapter that works with loose coffee, that is, without a separate pod, as is claimed. So, it's undisputed that every single embodiment... So, I'll ask you the same question. Under figure A, why would that not work with loose coffee? Well, because it would, for a number of reasons. One, the coffee would fall through. It may ruin the drink by the coffee going into the drink, and may fall as well. Okay, so you put a napkin there. And I say this because I actually did this in a hotel room a long time ago. I understand. And it worked. I think... I think that... I think... There are two keys. I certainly believe you're on it. I'm on a bench. Well, there are two keys to this. The first thing is, even by putting a napkin in there, that is a separate filter. It's not an integrated filter within that, within the receptacle itself. It's something that's separate. And the second thing that I'll point out is that this is something that just was not suggested by the specification. So, even if it works, there's no evidence in the record whatsoever that this was something that the inventor contemplated. There's nothing in the four corners of the patent that suggests that the inventor contemplated this. So, as your honors have noticed, there's not a single embodiment in the patent where a pod is not separate from the pod adapter or pod assembly. And also, it's undisputed that the patent does not disclose an integrated filter, even in its discussion of the prior art. And all the experts agreed on this. In fact, an arms expert was asked, and this is on page 721 of the appendix, at line 11, said, but nowhere in the 320 patent is there a suggestion to use an integrated filter media or an integrated filter mesh in a pod adapter assembly. Is there? And the answer was, to the best of my knowledge, the patent is silent on that option. And then, in the context of the patent, where a pod is referenced, it is always separate from the receptacle. So, the four corners of the patent, even as interpreted by an arms-owned expert, provide no suggestion whatsoever that a pod could possibly be coextensive with the pod assembly. Indeed, both Solifold and the Commission pointed out the deficiencies with arms interpretation of Figure 3A, as well as the dissent in the Commission, in our briefs, and the arms response was absolutely silent on that. So, while Solifold agrees with the Commission's analysis, this Court need not finally parse what is and what is not a pod or a cartridge in the context of the patent or in the art generally to affirm this finding of invalidity. The outcome of the written description question is the same under all of the very similar definitions of pod that the specification recites. All that matters is that the pod is separate from the pod assembly that holds it. Stated another way, a pod adapter assembly that can operate without a separate pod or filter, for example, a receptacle with an integrated filter, is materially different than the disclosed invention, which always requires a separate pod. So, in a footnote, and Arm mentioned it here today, Arm argued that the fact that the disclosed invention would not work with a separate pod or separate filter somehow supports the description. But the fact that disclosed invention might be usable with a separate filter, as Your Honor discussed, does not mean that it was disclosed to use a filter, and let alone the integrated filter that Arm attempts to import into the specification through its expert. So, the substantial evidence exists to support the commission's determination that the asserted claims are invalid for failure to meet the written description requirement. As alternative ground for affirmance, Solofill challenges the commission's determination that it did not have a reasonable good faith belief in non-infringement. And on this issue, the record lacks substantial evidence because there is absolutely no evidence in the record to contradict the unchallenged testimony of Mr. Vu, Solofill's executive. The reasonableness and good faith of Mr. Vu's beliefs was demonstrated by Solofill's assertion of corresponding non-infringement defenses. So, one of these defenses concerned the lack of a passageway in Solofill's product, and that defense may be best understood with reference to figures 1B and 2 of the 320 patent, and those are on appendix pages 244 and 246, and figure 2 identifies the passageway 212. So, in accordance with the patent, the brewed coffee flows through this narrow passageway, but in the Solofill products, by contrast, brewed coffee flows through large metal meshes on the sides and the bottom of the cup. And this good faith infringement position was that Solofill's integrated filter would not be understood as a passageway in the parlance of the patent. And the reasonableness of this argument was further confirmed from another district court's adoption of an effectively identical claim construction, which led to summary judgment in that related case. Moreover, by declining to cross-examine Mr. Vu, Arm elected not to develop any evidence that might undermine his good faith. And Arm cannot dispense with probing the veracity of Mr. Vu's beliefs on cross-examination and then presume that he did not know what he was talking about. I see that my time's almost up. I have a few comments on the domestic industry issue, if I may. Go ahead and conclude. Conclude with the domestic industry, or just conclude? Just conclude. Okay, no problem. Well, thank you, Your Honor. In conclusion, we respectfully request that the court affirm the defense. Okay. Thank you. Thank you very much. Mr. Condu, we'll restore you to three minutes. Your Honor, just a few points. It's Solofill's brief, page 24, that talks about how you could use what they say a pod or a filter. And as Your Honor recognized, yes, if you're looking at Figure 1A, you would recognize that, yes, perimeterial would fall out, so I need to put a filter there. And certainly a person of ordinary skill, how that person's been assigned, would understand that as well. Now, Solofill's counsel talked about an integrated filter as if it was some kind of revolution. Integrated filters existed in pod adapters as early as 2004. So there's a receptacle with an integrated filter that's one of the myriad filtration types that fall within the scope of a wide permeable material disclosed in the 320 patent. Again, this isn't some primitive and uncertain technology. We were talking about a container adapted to a whole brewing material. Secondly... It's just that the specification when it talks about pod, it does it in a consistent manner in different places. And it just seems to me that from what you were just arguing, that different types of filters existed in the industry, in the art at the time, that you could have very easily written the specification in a way so that we wouldn't be here. But it's not written that way. Certainly, Your Honor, I can understand that point. But what I will say again is if these things were known, and we're not talking about a primitive and uncertain technology, I say if, but it's in the record evidence that they were. If I have a definition of pod that says, it's a broad term, includes but not limited to, a package of water permeable material, then under this court's precedent, a person of ordinary skill reading that would understand, okay, yes, here's all the things that are known, I understand, I can use that. So there isn't a requirement that if something is well known, and if I read a portion of the specification that brings back that knowledge, there isn't a requirement that says, well, I have to spell out every detail. That's the Faulkner case. And so, yes, I understand, and Commissioner Keeve and dissent recognized, certainly there are a lot of embodiments and a lot of discussion on a pod being a separate paper packet. However, the issue is, is the written description broader than that? And our answer is yes. And I think a fundamental reason why is the background definition is what it was. And it talks about the background. There's a summary of the invention section. You argue that because of the words, but not limited to. I mean, if it hadn't been for that, you wouldn't have an argument. I mean, you're resting on those three words, but not be limited to. And you want to really broaden these claims in a big manner. Well, Your Honor, I would say that it's also my time's up, but if I may. Yeah, you didn't answer my question. The flattened disc-shaped, right, flattened disc-shaped paper packet. That's not part of the definition. The clause following, but not limited to, says a package of water permeable material. It doesn't say anything about the flattened disc-shaped paper packet. Okay, well, thank you very much. We thank all the parties for their arguments today. We stand in recess. The Honorable Court has adjourned until tomorrow morning at 10 a.m.